van Gestel, J.
This matter comes before the Court on Defendants’ Motion for Summary Judgment (Paper #46), Clean Harbors, Inc.’s Motion for Partial Summary Judgment (Paper #54), and the all too frequent array of ancillary related motions to impound documents, to strike supporting materials, to file memoranda in excess of 20 pages, and the like.

BACKGROUND

The plaintiff, Clean Harbors, Inc. (“Clean Harbors” or the “Company”), is a publicly traded company that maintains avast network of service centers and waste management treatment and disposal facilities and provides a broad range of environmental services. Clean Harbors’ stock has been publicly traded on the NASDAQ exchange under the symbol “CLHB” since 1987. Clean Harbors’ gross revenues for 2003 are projected to exceed $650 million.
The defendant John Hancock Life Insurance Company (“John Hancock”) is a Massachusetts insurance company, providing a broad array of insurance and investment products to retail and institutional customers. John Hancock also is an investor in a range of investments, including public and private securities. Like essentially all businesses, John Hancock intends that its revenue producing activities and operations will generate a sufficiently stable stream of income to meet its obligations to its policyholders, shareholders and investors.
The defendant John Hancock Variable Life Insurance Company (“JHVL”) is an affiliated company of John Hancock that provides variable life insurance coverage and an investment return to an underlying portfolio of investments chosen by the policyholders.
The defendants Signature 4 Limited (“Signature 4”) and Signature 5 L.P. (“Signature 5”) are each partnerships formed under the laws of and maintaining registered offices in the Cayman Islands. John Hancock participated in the formation of Signature 4 and Signature 5 and currently serves as their respective portfolio advisor.
The defendant Arrow Investment Partners (“Arrow”) is a partnership formed and existing under the laws of California. Arrow was created to acquire and actively manage a portfolio of investments for a small number of individual investors. Arrow often invests in high-yield debt securities.
The defendant Bill & Melinda Gates Foundation (the “Gates Foundation”) is a charitable trust, formed and existing under the laws of the State ofWashington. The assets of the Gates Foundation are invested pending distribution for the benefit of selected charitable causes.
The defendant Special Value Bond Fund, L.L.C. (“Special Value”) is a limited liability company formed and existing in the State of Delaware. Special Value is a private investment fund established to acquire and actively manage a diverse portfolio of investments.
The remaining defendants, Hare & Company, Blazerman & Co., and Coastledge & Co., are each business entities that, at least for the purposes of this case, hold certain promissory notes issued by Clean Harbors on behalf of respectively Signature 4 and Signature 5, the Gates Foundation and Arrow.
Clean Harbors was founded in 1980. At all relevant times, Clean Harbors’ corporate management was comprised of intelligent, competent, and “reasonably sophisticated” business people.
The mid-to-late 1990s were turbulent times for Clean Harbors and the industrial waste management industry as a whole. Growing excess capacity among industrial waste service providers, along with decreasing waste volumes, resulted in deteriorating pricing throughout the industry. This excess capacity created fierce competition that resulted in irrationally low pricing and net losses for many service providers. Various industry participants, including two of Clean Harbors’ largest competitors, Safety-Kleen Corp. (“Safety-Kleen”) and Philip Services Corp. (“Philip"), ultimately were forced to seek bankruptcy court protection.
Clean Harbors’ financial performance in the mid-to-late 1990s was adversely affected by the general “turmoil” in the industrial waste management industry. Clean Harbors suffered net losses for six straight years from 1995 through 1999, and its stock price plunged from a high of $17.50 per share in 1993 to a low of slightly more than $1.00 per share in 1999.
Clean Harbors had $50 million in 12[1]/2% senior notes coming due in May 2001 (the “Outstanding Indebtedness”). Clean Harbors’ management was aware that the failure to refinance that Outstanding Indebtedness “could materially adversely affect the Company.” Accordingly, refinancing Clean Harbors’ Outstanding Indebtedness became a priority for its management in the months and years leading up to the May 2001 repayment deadline.
Although there apparently was an improvement in conditions in the waste management industry starting in 1999, and Clean Harbors’ financial picture itself improved, it encountered difficulty in refinancing the Outstanding Indebtedness in 2000. As a result, in October 2000, Clean Harbors retained Deutsche Bank Securities, Inc. (“Deutsche Bank”) to “act as financial advisor in the structuring ... of a new credit Facility . . . and as exclusive agent in connection with the private placement... of subordinated debentures . .. *470 to be issued by” Clean Harbors. In its role as exclusive placement agent for Clean Harbors, Deutsche Bank, with the prior approval of Clean Harbors, was authorized to
contact potential investors, assist in the negotiation and structuring of the Facilities and Securities, and provide related services that Deutsche Bank deems advisable and reasonable that may facilitate the successful completion of the Structuring and Offering .. .
Deutsche Bank is an international investment concern that, through its Global Finance division, provides ideas, access and opportunities to emerging growth, mid and large capitalization companies through a complete range of investment banking products, industry sectors and regional markets. Deutsche Bank had served as a financial advisor to Clean Harbors in the past, including in the placement of the $50 million of 12 ½% senior notes that were coming due in May 2001.
Deutsche Bank held a series of meetings with Clean Harbors’ management for the purpose of understanding Clean Harbors’ needs, identifying financing alternatives, and beginning the process of compiling the necessary solicitation materials. In the course of those meetings, Deutsche Bank warned that, “[d]espite Clean Harbors’ recent momentum, the Company face[d] tight capital market conditions in refinancing its 12.50% Senior Notes due May 2001.” Deutsche Bank stated that “[h]igh-yield public bonds within a single B category [were] currently trading to yield 14% to 15%,” that “new issuance ha[d] come to a virtual standstill,” and that, “[a]s a result of these issues, current capital raising efforts [were] focused on the asset based loan market and the private mezzanine debt market.” Finally, Deutsche Bank predicted that “Clean Harbors [would] be required to address significant difficulties experienced by other waste services companies as a result of their aggressive consolidation strategies,” citing Safeiy-Kleen and Philip as examples. These negative factors, among others, were expected to drive up the cost of any refinancing package that Clean Harbors was able to arrange.
Deutsche Bank reviewed various potential financing structures with Clean Harbors, including additional secured borrowing, a further equity offering, a public debt offering, and an unsecured private or mezzanine debt offering. Clean Harbors ultimately chose to pursue a mezzanine finance deal because the other alternatives either were not viable or were deemed too expensive.
Clean Harbors’ management understood Deutsche Bank’s warnings concerning the tight capital markets that existed in the fall of 2000 and the resulting implications for Clean Harbors’ planned financing. An internal presentation by management to Clean Harbors’ Board of Directors in the fall of 2000 predicted that the Company probably could obtain mezzanine financing to “fill the void” left by its primary lenders, but that such financing was likely to be “EXPENSIVE.”
Deutsche Bank, acting for Clean Harbors, began soliciting mezzanine finance proposals from potential investors in late 2000. As part of that process, Deutsche Bank provided potential investor candidates with a lengthy “Confidential Information Memorandum” that contained, among other things, extensive background data on Clean Harbors and a “Summary of Terms” that Clean Harbors was prepared to offer investors.
The response from potential investors was “less than . .. originally hoped for.” Only a small handful of investors expressed much interest in the deal, and only two — John Hancock and Tannenbaum & Co. — offered proposed term sheets. Both submitted their financing proposals to Deutsche Bank on January 31, 2001, and those submissions were sent to Clean Harbors for review.
Despite some significant differences, Clean Harbors regarded the two alternative proposals as being “economically equivalent.” Clean Harbors nonetheless favored the John Hancock proposal because John Hancock was perceived to be a “local lender” that was further along in its due diligence and thus more likely to complete the needed refinancing by the rapidly approaching May 15, 2001, deadline. Management believed, however, that John Hancock’s proposed optional redemption provision was too restrictive. The John Hancock provision would have prohibited Clean Harbors from redeeming notes at any time during the first three years and required the payment of a fixed, but declining, prepayment premium thereafter.
At the time, Clean Harbors had no intention of prepaying the notes in the first three years, but it wanted the flexibility to do so just in case. Accordingly, Clean Harbors instructed Deutsche Bank to discuss the “no call” language with John Hancock and negotiate a revised proposal containing a more acceptable optional redemption provision.
In response, John Hancock agreed to substitute a revised optional redemption provision that would permit Clean Harbors to prepay the notes during the first three years if it wished to do so, provided that Clean Harbors also agreed to pay a “Make Whole Amount” that reduced the remaining payments due under the notes to a present value using a discount rate that varied according to the interest rates actually paid on United States Treasuiy securities at the time of payment. The discount rate that the parties utilized for the purposes of the Make Whole Amount formula was consistent with the anticipated yield on new investments made by John Hancock’s Bond Group overall during the preceding two years.
A “make whole” premium is a commonly used form of prepayment charge which is meant to compensate *471 the lender for the loss of income on reinvestment of the prepaid amount. It is not unusual for mezzanine finance terms to include a make whole in order to limit the borrower’s ability or desire to repay the investment prior to its scheduled maturity. Make wholes and other optional prepayment restrictions can be found in standard forms used by insurers and various other participants in the mezzanine finance industry.
Before conveying John Hancock’s revised optional redemption provision to Clean Harbors, Deutsche Bank personnel, using the mathematical formula contained in the revised provision, calculated estimated Make Whole Amounts that Clean Harbors could be required to pay if it redeemed the notes at various times in the first three years. Using then prevailing Treasury rates, the estimated Make Whole Amounts that Deutsche Bank calculated ranged from $10.5 million to $ 14.35 million. It is not clear from the record when, if ever, the results of these calculations were provided by Deutsche Bank to Clean Harbors.
After the management team at Clean Harbors reviewed the revised John Hancock optional redemption proposal, Deutsche Bank recommended that it be chosen because it was qualitatively “superior.” Clean Harbors followed Deutsche Bank’s advice and accepted the John Hancock proposal based on the “totality of all the circumstances.” The parties signed a formal term sheet on February 9, 2001. The term sheet was later revised to add three additional investors — Special Value, the Gates Foundation and Arrow — as participants. John Hancock remained the lead investor with responsibility for negotiating the final deal documents.
Clean Harbors was represented by its long-time outside counsel, Davis, Malm & D’Agostine, P.C. (“Davis, Malm”) in the preparation of the official refinancing documentation.
Highly experienced attorneys at Davis, Malm participated. Sullivan & Worcester represented John Hancock and the other purchasers.
It took a few weeks and lots of communication back and forth among the attorneys and their clients, all leading to a Board of Directors “unanimous! ]” approval on April 25, 2001. In the words of Mr. Malm, the “quarterback” of the Clean Harbors refinancing legal team and the company’s longtime Clerk, they were “just happy to have” the deal.
After execution of the necessary documentation, the deal was ultimately funded by John Hancock and the other purchasers on April 30, 2001. At Clean Harbors’ request, the purchasers wired their respective shares of the funding amount to Clean Harbors’ bank early in the day on April 30, 2001, so that Clean Harbors could meet an 11:00 a.m. deadline for the repayment of its Outstanding Indebtedness.
Section 4.1 of the Securities Purchase Agreement (“SPA”), “Dated as of April 12, 2001,” reads as follows:
The Company may prepay the Notes, in full, or in part in integral multiples of $1,000,000 on any date. Prepayments of the principal of any Notes shall be made together with (a) interest accrued on the principal amount being paid to the Settlement Date and (b) the Make Whole Amount.
Section 10 of the SPA contains 14 single-spaced pages of definitions. Included are the definitions of “Discounted Value” and “Make Whole Amount.” For purposes relevant to the present motions, they read as follows:
“Discounted Value” means, with respect to the Called Principal of any Note, an amount obtained by discounting all Remaining Scheduled Payments from their respective scheduled due dates, in accordance with accepted financial practice and at a discount factor (applied on a quarterly basis) equal to the Discount Rate with respect to such Called Principal.
“Make Whole Amount” means:
(ii) with respect to any other payment:
(a) If the Settlement Date is on or before April 30, 2004, with respect to the Called Principal of any Note, an amount equal to the excess, if any, of (x) the Discounted Value over (y) the sum of (i) such Called Principal plus (ii) interest accrued and unpaid thereon, as of and due on the Settlement Date with respect to such Called Principal but in no event less than zero; or . . .
Section 4.9 of the SPA reads as follows:
The Company acknowledges that the Make Whole Amount due at any optional or required prepayment of the Notes (including any prepayment required pursuant to any provision of Section 4 or Section 7.2} has been negotiated with the Purchasers to provide a bargained for rate of return on the Purchasers’ investment in the Notes and is not a penalty.
Section 7.2(ii) of the SPA reads, in relevant part:
If any Event of Default . . . shall exist, the Required Holders shall have the right to declare all the Notes then outstanding to be immediately due and payable in full at 100% of the outstanding principal amount thereof together with all interest accrued thereon and the Make Whole Amount, without any presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived.
Section 7.2(iii) of the SPA reads, in relevant part:
Any Holder who or which shall not have consented to any waiver with respect to [certain] Event[s] of Default may, at its option, declare its Notes to be *472 immediately due and payable in full at 100% of the outstanding principal amount thereof together with all interest accrued thereon and the Make Whole Amount, without any presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived.
Section 8.16(i) of the SPA states:
The Bank Loan Documents, Transaction Documents, the Financial Statements, and the certificates furnished to the Purchasers pursuant to Section 3.1 do not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained herein and therein, in light of the circumstances under which they were made, not misleading.
Section 12.11 of the SPA states:
THIS AGREEMENT IS TO BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, AND THE RIGHTS OF THE PARTIES SHALL BE GOVERNED BY, THE LAWS OF THE COMMONWEALTH OF MASSACHUSETTS (WITHOUT GIVING EFFECT TO ANY LAWS OR RULES RELATING TO CONFLICTS OF LAWS THAT WOULD CAUSE THE APPLICATION OF THE LAWS OF ANY JURISDICTION OTHER THAN THE COMMONWEALTH OF MASSACHUSETTS).
Among the transaction documents that Clean Harbors executed and provided to John Hancock and the other purchasers in April 2001 were Clerk’s Certificates, prepared by Davis, Malm, which state that the signature of Clean Harbors’ Senior Vice President, Stephen H. Moynihan, to the SPA and related documents constitutes
conclusive evidence of (their) having been deemed necessaiy or appropriate and ratified and approved by these resolutions and the Company and of [their] binding effect on this Company.
On the same day that the Clean Harbors refinancing transaction was funded, each of Special Value, the Gates Foundation and Arrow filed notifications with the Office of the Massachusetts Attorney General pursuant to G.L.c. 271, Sec. 49(d). These notifications were “hand-delivered to the Office of the Massachusetts Attorney General by Nicole L. Rives, Esq. of the law firm of Sullivan & Worcester, LLP, sometime in the mid-to-late afternoon of April 30, 2001.” John Hancock and other purchasers previously had filed notifications with the Attorney General which, according to the provisions of G.L.c. 271, Sec. 49(d), remained in effect for two years after filing.
Just a few months after the closing of the Securities Purchase Agreement, an opportunity arose for Clean Harbors to buy the Chemical Services Division (“CSD”) of Safety-Kleen, which by then had been in bankruptcy since June 2000. Apparently, Safety-Kleen could not effectuate a plan of reorganization because of its substantial environmental liabilities which took priority over its obligations to secured creditors. CSD hadrevenuesofapproximately $500million.
For a substantial period of time CSD had been Clean Harbors’ strongest competitor. Other strong competitors of Clean Harbors also exhibited interest in acquiring CSD. The basis for all parties’ interest in CSD was that the winning bidder would likely become the leading provider of hazardous waste services in North America. The losers, in contrast, would find themselves in the unenviable position of lacking the ability to create higher operating margins and cash flow which the combination with CSD would create. The losers’ inability to compete with the winner for crucial business would likely result in a substantial, and perhaps fatal, financial blow.
Clean Harbors concluded, along with its experts, that it had to make a strong effort to acquire CSD or its very existence might be at stake.
After many months of effort, Clean Harbors was able to enter into an agreement to acquire CSD. This transaction, as finally structured, called for Clean Harbors to pay Safety-Kleen $46 million (eventually lowered to $34.2 million) plus assume $265 million of environmental liabilities. Because of the need to provide financial assurances in the event of closure of the facilities, Clean Harbor had to obtain $255 million in financing in order to close. The transaction was announced in February 2002, and Clean Harbors’ stock price immediately went up approximately $4 to $15 per share.
The CSD acquisition would put Clean Harbors in technical default under the SPA and allow acceleration of the maturity of the Notes. As the closing of the CSD acquisition neared, Clean Harbors’ lenders for its new financing indicated that they would not fund the transaction unless the situation with John Hancock and the other purchasers was resolved.
Clean Harbors signed the closing documents for the purchase of CSD on September 6, 2002. As a result of the CSD purchase, pursuant to Section 5. l(vi) of the SPA, also on September 6, 2002, Clean Harbors was obligated to, and did, provide John Hancock and the other purchasers with an Officers’ Certificate notifying them that Clean Harbors was then in default of its Negative Covenants 6.1, 6.2, 6.3, 6.4, 6.8 and 6.10 (relating to assumption of additional indebtedness, additional liens, additional guarantees, entry into acquisitions, restrictive agreements, and default as to certain financial covenants), all of which constituted an Event of Default under the SPA.
On September 9, 2002, the Note holders delivered notice to Clean Harbors pursuant to Section 7.2(ii) of the SPA demanding payment of the Notes, accrued interest, and the Make Whole Amount.
*473 On September 10, 2002, Clean Harbors paid the Notes and accrued interest. It also paid the $16,991,129.44 Make Whole Amount, under protest. The protest letter stated:
As you know, the Company is of the view that the Make Whole Amount, of which your clients are demanding payment, is unreasonable, irrational and unconscionable and that it is an unenforceable penalty. Accordingly, while the Company will pay the Make Whole Amount, it reserves all of its rights with respect thereto, including its right to seek full reimbursement of the Make Whole Amount from your clients. The Company waives none of its rights or remedies.
The foregoing background sets the stage for the present summary judgment motions.

DISCUSSION

Summary judgment is granted where there are no issues of genuine material fact, and the moving party is entitled to judgment as a matter of law. Lindsay v. Romano, 427 Mass. 771, 773 (1998); Hakim v. Massachusetts Insurers’ Insolvency Fund, 424 Mass. 275, 283 (1997); Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991); Cassesso v. Commissioner of Correction, 390 Mass. 419, 422 (1983); Mass.R.Civ.P. 56(c). The moving party bears the burden of affirmatively demonstrating that there is no triable issue of fact. Pederson v. Time, Inc., 404 Mass. 14, 17 (1989).
In assessment of the principal legal issues presented by the cross motions, the Court feels somewhat like Odysseus in the Odyssey, passing between Scylla and Charybdis. The law is stated in two relatively innocuous cases: A-Z Servicenter, Inc. v. Segall 334 Mass. 672 (1956), and Renda v. Gouchberg, 4 Mass.App.Ct. 786 (1976).
A-Z Servicenter involved a prepayment provision in connection with a mortgage note for $20,000 on a gasoline filling station. The SJC, at p. 675, stated the law in that case as follows:
Whether a provision of a contract for the payment of a sum upon breach is rendered unenforceable by reason of being a penalty depends upon the circumstances of each case ... Where actual damages are difficult to ascertain and where the sum agreed upon by the parties at the time of the execution of the contract represents a reasonable estimate of the actual damages, such a contract will be enforced . . . But where the actual damages are easily ascertainable and the stipulated sum is unreasonably and grossly disproportionate to the real damages from a breach, or is unconscionably excessive, the court will award the aggrieved party no more than his actual damages . . . The words “liquidated damages and not as a penally” in the instant note is not decisive.
At p. 676, the SJC went on to say:
An acceleration clause advancing the maturity of the principal upon a breach of a mortgage note at the option of the holder is a common provision and has been held legal and binding in this Commonwealth . . . This would also be true as to interest if the acceleration extended no further than to include the interest actually due at the time of the breach . . . We think the judge was right in ruling that the acceleration provision in the note constituted a penalty.
Renda is a single-paragraph rescript opinion from the Appeals Court coming just a few months short of 20 years after A-Z Servicenter. It too involved a prepayment provision in connection with a mortgage note. Somewhat cryptically, the Appeals Court ruled:
Assuming, as we must on this record, that the underlying obligation is enforceable, the prepayment provision is not void as a penalty. Unlike the acceleration clause in A-Z Servicenter, Inc. v. Segall, 334 Mass. 672 (1956), the interest required to be paid bears a “rational relation” (id. at 676) to the defendants’ actual damages on prepayment, merely securing to the defendants the “benefit of [their] bargain” with the plaintiffs . . . Because the defendant . . . was not required by law to permit prepayment. . . and because the plaintiffs’ prepayment constituted a voluntary election on their part, cases concerning penalties payable as “liquidated damages” in the event of breach . . . are inapposite.
Judge Botsford, in Dellorfano v. The New England, No. 88-3616, at 5 n.3 (Mass.Super.Ct., July 19, 1990), stated that the legal distinction between voluntary and involuntary prepayments
stem[s] from the fact that, when prepayment is voluntary, no breach of contract has occurred; there is thus no theoretical justification for scrutinizing the premium as a form of damages. Instead, it seems more appropriate that the' prepayment premium be viewed as a bargained for fee that is tendered in exchange for the privilege of paying the debt early.
This Court agrees.
In the case before this Court, it must be decided upon the undisputed record whether this is a situation of the application of an acceleration provision, and if so whether it constitutes a penalty, or whether this is the enforcement of a prepayment provision securing to the lenders the benefit of their bargain in the face of a voluntary election to prepay by Clean Harbors.
The Court starts on September 6, 2002. That was the date that Clean Harbors signed the closing documents for the purchase of Safety-Kleen’s CSD. Although market forces made this a highly desirable acquisition by Clean Harbors, John Hancock and the *474 other purchasers of the Notes had absolutely nothing to do with those market forces. This action by Clean Harbors cannot be seen, as a matter of fact or law, as other than a voluntary election which had the effect of putting Clean Harbors in default of its obligations under the SPA. Indeed, Clean Harbors recognized that situation when, on that same day, pursuant to Section 5.1(vi) of the SPA, it provided John Hancock and the other purchasers with an Officers’ Certificate notifying them that it was in default of its Negative Covenants 6.1, 6.2, 6.3, 6.4, 6.8 and 6.10.
The Officers’ Certificate did more than just comply with the reporting requirements of Section 5.1(vi) of the SPA. It revealed, in Clean Harbors’ own words, that it was bound to close the CSD acquisition. The words used in the Officers’ Certificate, after reporting on the defaults, read as follows:
said Defaults constitute an Event of Default under Section 7.1(v) of the Agreement;
Said Defaults and Event of Default have been extant since September 6, 2002; and
The Company has not taken is not taking and does not propose to take any action with respect to said Defaults and Event of Default.
By stating that the defaults “have been extant since September 6, 2002,” Cleans Harbors has conceded that: as of that date it had incurred or assumed impermissible debt (SPA Sec. 6.1); it had incurred, assumed or permitted impermissible liens on its property (SPA Sec. 6.2); it had incurred impermissible contingent liabilities (SPA Sec. 6.3); it had entered into an impermissible transaction to acquire a business out of the ordinary course of its business (SPA Sec. 6.4); it had entered into an impermissible agreement or arrangement containing restrictive covenants (SPA Sec. 6.8); and it was in violation of certain financial covenants (6.10). All of this only could have occurred through the binding entry into the acquisition of CSD and the financing therefor, all as of September 6, 2002.
As alleged by Clean Harbors in Paragraph 35 of its complaint, “Clean Harbors’ lenders for its new financing [for the CSD acquisition] indicated that they would not fund the transaction unless the situation with John Hancock was resolved.” This allegation is binding on Clean Harbors. See G.L.c. 231, Sec. 87. The “situation with John Hancock,” of course, involved the rights of John Hancock and the other purchasers under the SPA, including the prepayment provisions and the Make Whole Amount. As noted above, on September 10, 2002, Clean Harbors paid the Notes and accrued interest. It also paid the $16,991,129.44 Make Whole Amount, albeit the latter was under protest. These payments were either voluntary on Clean Harbors’ part or required by its new lenders in connection with the CSD acquisition and financing. Again, John Hancock and the other purchasers of the Notes were not involved in the CSD acquisition or its financing.
Between September 6, 2002, the date that Clean Harbors’ obligations in the CSD transaction became “extant,” and September 10, 2002, when it paid the Make Whole Amount, on September 9, 2002, John Hancock and the other purchasers delivered notice to Clean Harbors pursuant to Section 7.2(ii) of the SPA demanding payment of the Notes, accrued interest, and the Make Whole Amount.
Before stating its conclusions, this Court pauses to observe that all parties in this case are extremely sophisticated, all had the constant advice and assistance from highly competent counsel, and Clean Harbors, in particular, operated with the advice and guidance of Deutsche Bank in the transaction that led to the SPA, including the prepayment and Make Whole Amount provisions contained therein. This sophisticated group negotiated and chose specific language for its transaction. Here — perhaps more than in situations in which there is a disparity in bargaining power or a general lack of sophistication about the matter at hand — where knowledgeable and fully represented parties chose to embody their relationship in a detailed and carefully crafted written instrument, they are entitled to and should be held to the language they chose.
The Court must be careful not to impose its own views on the contracting parties or to let matters outside the four corners of the instruments that are specifically anticipated and addressed therein overwhelm or change the documents themselves. “[Agreements are made to be performed, and relief should be given in the absence of special circumstances showing that it would be inequitable to do so.” Freedman v. Walsh, 331 Mass. 401, 406 (1954). No special circumstances have been demonstrated here. It is not the role of the Court to alter the parties’ agreement. “Even if it be found that the contract, according to its true meaning . . . fails to become operative, it is not for the [C]ourt, in order to give it operation, to suppose a meaning which the parties have not expressed ...” Shoe & Leather Nat’l Bank v. Dix, 123 Mass. 148, 150 (1877). In short, this is not the time for the Court to attempt to be smarter than the parties.
Clean Harbors knew full well what it was getting into when it became a party to the SPA in April of2001. It fully understood the Make Whole Amount and the prepayment provisions. Indeed, its financial consultant, Deutsche Bank, went so far as to run the numbers on potential Make Whole Amounts and, thereafter, recommended the SPA to Clean Harbors.
At least Deutsche Bank, and probably Clean Harbors, by at least sometime in 2002 before the closing on the CSD acquisition, was aware that the Make Whole Amount could be in the range of $14.35 million *475 and, as actually paid, turned out to be $16.99 million, which was a variation of only 18.1%.
Clean Harbors also knew, full well, what it was getting into in connection with the Safety-Kleen CSD acquisition, both with regard to the requirements of its new lenders and the obligations to John Hancock and the other purchasers under the SPA. It made its choice with its eyes wide open. And it did so for reasons that seemed highly beneficial for Clean Harbors.[2]
The Make Whole Amount is not a penalty payable as liquidated damages in the event of a breach. Rather, it is a payment that came about as a result of Clean Harbors’ voluntary election to put itself in a position whereby it prepaid the Notes to facilitate the CSD acquisition. The “liquidated damages" analysis in A-Z Servicenter does not apply here. The Make Whole Amount was, instead, a bargained for fee paid in exchange for the privilege of paying a debt early.
The September 9, 2002, “acceleration” by John Hancock and the other purchasers does not change the situation. By then, Clean Harbors had already bound itself, voluntarily, to go forward with the CSD acquisition and the prepayment of the PSA debt required by its new lenders.
Nor is there any gross disproportionate number between the actual Make Whole Amount of $16.9 million paid and the $14.35 million calculated by Deutsche Bank before Clean Harbors entered into the PSA in April of 2001. Only the circumstances that existed at the time of the contract formation matter on the issue of the enforceability of a liquidated damages clause. See Kelly v. Marx, 428 Mass. 877, 880 (1999). Thus, even if this situation were treated under an A-Z Servicenter analysis, there can be no finding of a “grossly disproportionate” amount on the facts presented.
Clean Harbors makes an argument as to some, but not all, defendants predicated on the requirements of G.L.c. 271, Sec. 49, the criminal usury statute. Sub-part (d) to Sec. 49 contains a safe harbor provision that reads, in relevant part, as follows:
The provisions of paragraph (a) to (c), inclusive, shall not apply to any person who notifies the attorney general of his intent to engage in a transaction or transactions which, but for the provisions of this paragraph, would be proscribed under the provisions of paragraph (a) providing any such person maintains records of any such transactions. Such notification shall be valid for a two-year period and shall contain the person’s name and accurate address . . . Such records shall contain the name and address of the borrower, the date the loan is made and the date or dates on which any payment is due . . .
In this matter, all purchasers of the Notes, except for Special Value, the Gates Foundation and Arrow, filed notifications with the Office of the Massachusetts Attorney General pursuant to G.L.c. 271, Sec. 49(d) prior to April 30, 2001, and their notices were within the two-year requirement.
The notifications of Special Value, the Gates Foundation and Arrow were “hand-delivered to the Office of the Massachusetts Attorney General by Nicole L. Rives, Esq. of the law firm of Sullivan & Worcester, LLP, sometime in the mid-to-late afternoon of April 30, 2001.” At Clean Harbors’ request, Special Value, the Gates Foundation and Arrow wired their respective shares of the funding amount to Clean Harbors’ bank early in the day on April 30, 2001, so that Clean Harbors could meet an 11:00 a.m. deadline for the repayment of its Outstanding Indebtedness. Consequently, their notices were received by the Attorney General’s Office on the same day that the loans were made, but physically arrived there two or three hours later in the day.
G.L.c. 277, Sec. 49 is a criminal statute and, as such, must be strictly construed. See Hakim Enterprises, Inc. v. Reinhardt, 30 Mass.App.Ct. 911 (1991). In reaching its decision in Hakim, the Appeals Court expressly noted and followed
the ordinary rule of construction that any criminal statute is construed strictly against the Commonwealth. Any reasonable doubt as to the meaning of a criminal statute must be resolved in favor of a defendant, that is, against finding a criminal violation.
Id. at 30 Mass.App.Ct. 911-12.
Further, here, given that the reason for the slight delay in filing the notice with the Attorney General by Special Value, the Gates Foundation and Arrow was solely the result of accommodating Clean Harbors’ morning satisfaction of its pay-off of its Outstanding Indebtedness, there is no reason to find fault with the filings of the notice to the Attorney General a few hours after funding the loan. Indeed, the statute itself makes no provision as to when the notice must be filed. It speaks in a contradicting fashion of including the “intent” to make the loan — which sounds like something that precedes the transaction — and including “the date the loan is made and the date or dates on which any payment is due” — which often, indeed generally, is not known until the day of the transaction.
On the foregoing background and discussion of the summary judgment motions, no mention is made of the defendants Hare & Company, Blazerman & Co., and Coastledge & Co. They were not parties to the PSA and cannot be sued for a breach thereof. Palmer Sav. Bank v. Insurance Co. of North America, 166 Mass. 189, 195-96 (1896). These defendants were merely holders or custodians of the subordinated notes is *476 sued by Clean Harbors for the benefit of the other defendants. They have no independent stake in the outcome of this litigation and Clean Harbors can recover nothing from them.
The foregoing discussion resolves this Court’s consideration of the cross-motions for summary judgment. The Court now turns, briefly, to the remaining ancillary motions.

Defendants’ Motion to Impound Exhibits to Summary Judgment Submission (Paper #48) and Clean Harbors, Inc. 's Motion to Impound Exhibit Binders (Paper #52)

By these two motions the parties seek to have impounded certain documents submitted in support of and in response to the defendants’ motion for summary judgment. In a Memorandum and Order dated July 21, 2003, in this case, this Court expressed its serious reservations about the impoundment of matters presented in civil proceedings in a public court. It has examined the matters now sought to be granted secrecy protection and has considered the nature of the parties and the controversy, the type of information and the claimed privacy interests involved, the extent of community interest, and the reasons for the requests. All things considered, this Court is not convinced that impoundment is warranted and both motions will be denied.

Clean Harbors, Inc.’s Emergency Motion to Strike Defendant-Lenders’ Post-Hearing Affidavit (Paper #11)

This motion seeks to have stricken the Affidavit of Brian A. Davis and Appendix to Defendants’ Reply Memorandum in Support of Summary Judgment. The affidavit challenged was filed the day after oral argument on the cross motions for summary judgment.
This Court has been buried in a huge mass of papers by both sides. Its “Background” section above reveals those facts that the Court, from the multiple Rule 9A(b)(5) statements and the complaint filed, found to be not in dispute for purposes of the motions under consideration. This Court is not now going to pore over the various filings supporting the Rule 9A(b)(5) statements to determine from which, if not more than one, source the facts were determined.
This motion will be denied.

Clean Harbors, Inc.'s Motion in Limine and to Strike (Paper #49)

By this motion, Clean Harbors asks the Court to strike portions of the defendants’ summary judgment materials and to preclude them from offering evidence or argument at trial as to matters they prevented Clean Harbors from discovering by invoking the attorney/client privilege. What is at stake apparently is whether certain witnesses, on attorney/client privilege grounds, declined to testify as to the “reasons and motivations for... [the] decision on September 9,2002 to accelerate the maturity of Clean Harbors’... debt and demand that Clean Harbors pay the notes as well as a $16,991,129.44 ‘Make Whole Amount.’ ”
This Court, in deciding the summary judgment motions, did not consider the reasons for the actions of any of the sophisticated parties involved in this case. It focused on what was said in their agreement and what they did, not the reasons for what they did. As a motion to strike, this motion will be denied. Whether it ever will have legs as a motion in limine depends heavily upon whether this case ever goes to trial. Given the ruling on the motions for summary judgment, it is not now headed in that direction.

Clean Harbors, Inc. ’s Motion to Strike Summary Judgment Materials Submitted by the Defendant-Lenders (Paper #50)

For the reasons applied to the previous two motions, this motion also will be denied.

ORDERS

1. Defendants’ Motion for Summary Judgment (Paper #46) is ALLOWED;
2. Clean Harbors, Inc.’s Motion for Partial Summary Judgment (Paper #54) is DENIED;
3. Clean Harbors, Inc.’s Emergency Motion to Strike Defendant-Lenders’ Post-Hearing Affidavit (Paper #11) is DENIED;
4. Defendants’ Motion to Impound Exhibits to Summary Judgment Subsmissions (Paper #48) is DENIED;
5. Clean Harbors, Inc.’s Motion In Limine and To Strike (Paper #49), treated as a motion to strike only, is DENIED;
6. Clean Harbors, Inc.’s Motion to Strike Summary Judgment Materials Submitted by the Defendant-Lenders (Paper #50) is DENIED; and
7. Clean Harbors, Inc.’s Motion to Impound Exhibit Binders (Paper #52) is DENIED.
An appropriate final judgment shall enter accordingly

Clean Harbors, in a Press Release dated September 11, 2002, provided as part of its counsel’s affidavit, extols the benefits of the CSD acquisition. Included is the statement: “As a result of the acquisition, Clean Harbors will be on a run rate to achieve annualized revenues of approximately $750 million ...”